# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# EASTERN DIVISION

| | |
|---|---|
| TERRY MATTHEWS, MIKE VANCE and ROBERT JAGGERS, ) ) ) | |
| Plaintiffs, ) ) | |
| VS. ) ) | No. 03-1210-T/An |
| MCNAIRY COUNTY, TENNESSEE and TOMMY RILEY, in his Official Capacity as Sheriff of McNairy County and Individually, ) ) ) ) ) ) | |
| Defendants. ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This action was filed pursuant to 42 U.S.C. § 1983 by plaintiffs Terry Matthews, Mike Vance,[1] and Robert Jaggers against McNairy County, Tennessee, and McNairy County Sheriff Tommy Riley. Plaintiffs were formerly employed as deputies by the McNairy County Sheriff's Department. The complaint alleges that they were terminated in violation of their right to due process under the Fourteenth Amendment and in retaliation for exercising their First Amendment right to openly support Riley's opponent, incumbent sheriff Paul Ervin, in the 2002 election. Plaintiffs also invoke the Court's supplemental

---

[1] On October 8, 2004, the Court issued an order granting defendants' motion to dismiss the claims of plaintiff Mike Vance with prejudice. The Court noted that counsel for the plaintiffs had been unable to locate Vance since the action was filed, so that there had been no response to the defendants' discovery requests.

jurisdiction to hear causes of action under Tennessee law for wrongful termination under Tenn. Code Ann. § 7-51-1501 and defamation, specifically, providing false information to prospective employers under Tenn. Code Ann. § 50-1-105. Plaintiffs seek an award of both compensatory and punitive damages. Before the Court is the defendants' motion for summary judgment, to which plaintiffs have filed a response.

Motions for summary judgment are governed by Fed. R. Civ. P. 56. If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Fed. R. Civ. P. 56(c). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The opposing party may not rest upon the pleadings but must go beyond the pleadings and "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 323.

"If the defendant . . . moves for summary judgment . . . based on the lack of proof of a material fact, . . . [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). However, the court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter but only to determine whether there is a genuine issue for trial. Id. at

249. Rather, "[t]he inquiry on a summary judgment motion . . . is . . . 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty Lobby, 477 U.S. at 251-52). Doubts as to the existence of a genuine issue for trial are resolved against the moving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970).

The unrefuted facts in the record show that in 2002 plaintiffs Matthews and Jaggers were employed as deputies with the McNairy County Sheriff's Department under Sheriff Paul Ervin. In January of that year, plaintiffs were disciplined by Sheriff Ervin for their involvement in an attempt to play a practical joke on the 911 dispatchers. The plan was for Matthews to climb through the ceiling in the men's restroom, while Jaggers held the ladder for him. Matthews then would crawl over to the dispatchers' office, raise one of the ceiling tiles there and scare the dispatchers. However, Matthews lost his footing and fell through the ceiling into the 911 office, getting tangled in some wires in the process and damaging a surveillance camera. Ervin suspended the plaintiffs without pay for three days, and required them to pay $800 to repair the damage. The incident was covered by the local newspaper and investigated by the Tennessee Bureau of Investigation. (Matthews Dep. at 31-38; Jaggers Dep. at 17-23.)

Later in 2002, defendant Riley challenged Ervin in the McNairy County Sheriff's election. Matthews and Jaggers placed signs in their yards supporting Ervin and, if asked,

would state that they were supporting Ervin. However, neither Matthews nor Jaggers contributed money to Ervin's campaign, attended fund-raisers or rallies supporting him, had a bumper sticker on their vehicle, or were involved in his campaign in any other way. (Matthews Dep. at 42-43; Jaggers Dep. at 25-27.)

Riley defeated Ervin in the August 2002 election. Prior to taking office, he consulted with the McNairy County attorney, Craig Kennedy, about whether it would be legal if he chose not to retain Matthews and Jaggers as deputies, since they were employees-at-will. Kennedy questioned Riley to ensure that he did not seek to fire the deputies for supporting his opponent. Satisfied that Riley's decision was based on the practical joke incident in the 911 office, Kennedy advised that, in his opinion, Riley could legally fire Matthews and Jaggers. (Kennedy Aff. ¶¶ 3, 6-7; Riley Aff. ¶¶ 3-4, 6.) Consequently, Matthews and Jaggers were terminated.

Following his termination, Matthews applied for a position with the Jackson Police Department and received a bad job reference. However, Matthews does not know whether that reference came from Riley or anyone at the McNairy County Sheriff's Department. (Matthews Dep. at 59-60.) Jaggers also applied for work with other entities, including the Hardin County Sheriff's Department. Hardin County Sheriff Sammy Davidson told Jaggers that he received a phone call from someone who identified himself as the McNairy County Sheriff. The person wanted to know why Davidson was going to hire Jaggers; however, when Davidson specifically asked the caller's identity, the person hung up. Jaggers did not

4

know who the caller actually was. (Jaggers Dep. at 41-43.)

In order to establish a claim for First Amendment retaliation, the plaintiffs must prove three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." Sowards v. Loudon County, Tenn., 203 F.3d 426, 431 (6th Cir. 2000) (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). If plaintiffs meet that burden, the burden then shifts to the defendants to prove that the adverse employment action would have been taken even in the absence of the protected conduct. Board of County Comm'rs v. Umbehr, 518 U.S. 668, 675 (1996); Sowards, 203 F.3d at 431.

The defendants do not dispute that the plaintiffs have met the first two elements of their retaliation claim. Support of a political candidate falls within the scope of the right of political association protected by the First Amendment. See Elrod v. Burns, 427 U.S. 347, 356 (1976).[2] In addition, plaintiffs were terminated from their positions. This action, if motivated by their political activities, would deter a "person of ordinary firmness" from engaging in such activity. Defendants contend, however, that the plaintiffs cannot establish a causal connection between the terminations and their protected political activity. In addition, defendants maintain that the plaintiffs would have been terminated even in the

---

[2] There is no claim that the plaintiffs were the type of confidential, policy-making employees for which political affiliation is an appropriate job requirement, and who may be excepted from Elrod's general rule.

5

absence of their support of Ervin for sheriff.

In his deposition, Riley testified that his sole motivation in firing Matthews and Jagger was the practical joke incident at the 911 office. (Riley Dep. at 55.) He further states in his affidavit that he sought, and relied upon, the advice of the county attorney in making that decision. (Riley Aff. ¶¶ 3-5.) In addition, the deposition testimony of both Matthews and Jaggers shows that they also believed their termination to have been motivated by the incident in the 911 office. Matthews testified:

> Q. Now, Mr. Matthews, you allege in your complaint that you were intentionally fired because of your political beliefs. On what facts do you rely to make that allegation?
> A. Well, just like that deal up there at 911 with Ruth and all them that work at 911. That comment was made up there that the rat pack, was what we were called, that they were gone if Tommy got elected – or when he got elected.

(Matthews Dep. at 68.)

> Q. Anybody ever said that Tommy Riley said you're going to get fired because you've got an "Ervin For Sheriff" sign in your yard?
> A. No.

Id. at 70.

> Q. Has anybody told you that Sheriff Riley said that he was going to terminate you because you verbally said you supported Sheriff Ervin?
> A. Has anybody told me that?
> Q. That Sheriff Riley said that he was going to terminate you because of your political support of Sheriff Ervin?
> A. No.

Id. at 72.

6

Jaggers testified regarding his termination as follows:

Q. In your complaint, you state that Sheriff Riley made campaign promises to get rid of you and Mr. Matthews if he was elected sheriff based on your support of Sheriff Ervin.
A. That was rumored in McNairy County, yes ma'am.
Q. Okay. Who told you that?
A. Anyone you met.
Q. Was he making promises to fire anybody who supported Sheriff Ervin, or just you three?
A. Well, he – we were referred to as a rat pack, and there might be some others that he got rid of, yes.
Q. Any idea why he was singling you three out – the rat pack out?
A. I assume this came from one or two people out of 911 dispatch. I assume that's where it came from. And she's pretty controversial about talking to people and –
Q. Is that Ruth Travis that you're –
A. Yes, ma'am.
Q. – referring to? So you assume that the reason the rumors were going around was because of the 911 incident?
A. That's the way it seemed, yes.

(Jaggers Dep. at 33-34.)

Q. Okay. Here's what I'm asking you, Mr. Jaggers. Has anybody come to you and said, Tommy Riley told me he was going to fire you if he got elected?
A. Mm-hum.
Q. Who?
A. Joe David Pettigrew, Dorothy Pettigrew.
Q. Dorothy?
A. Mm-hum. Sheriff Ervin even told me that he had heard that through the rumors.
Q. But I'm not asking about what he had heard through a rumor. I'm asking what individual came to you and said, Tommy Riley told me personally that he was going to fire you if he got elected?
A. Those two people. But you have to understand how those two people interact.
Q. Okay. Explain what you mean.
A. They're good – they're very good at spreading rumors also. Rumors

7

> was running rampant in McNairy County.
>
> Q. So are you saying that because they're good at spreading rumors, what they told you may not have been exactly what they were told?
>
> A. Could not have been. The night I heard that, there was a group of people there, and they were all drinking. You start one thing. Then by the time it gets down here, it's – it's really bad.
>
> Q. Okay.
>
> A. But he had told me. Now, that had come out of his mouth. And Ms. Pettigrew told me that out of her mouth.
>
> Q. Okay. What exactly did they say?
>
> A. They refer to you all three as the rat pack. And when he becomes the sheriff, you all are fired.
>
> . . . .
>
> Q. Okay. Did Mr. or Mrs. Pettigrew tell you why Sheriff Riley was supposedly going to fire you?
>
> A. It was for the 911 incident, I think, and then some other deal, like Mr. Matthews was explaining to you there, that happened maybe a year, year and a half earlier.

Id. at 47-49.

In their response in opposition to the motion for summary judgment, plaintiffs argue that the evidence on the issue of retaliation is disputed. Plaintiffs point out that their support of Ervin in the 2002 election was generally known in McNairy County. However, the mere fact that Riley may have known the plaintiffs supported Ervin is, without more, insufficient to create a genuine issue of material fact regarding the reason for their termination.

Plaintiffs also assert that the incident in the 911 office could not have been the reason for their termination because (1) they had already been disciplined for the incident and (2) all Riley knew of the incident was what he read in the newspaper. However, while these facts may have some bearing on the wisdom of Riley's stated reason for plaintiffs' termination, they are insufficient to raise a genuine issue of material fact regarding the

8

motivation for that decision.

The Court concludes that the plaintiffs have failed to show that there are material facts in dispute on the issue of whether their termination was a violation of their rights under the First Amendment.

The parties do not actually address plaintiffs' claim that they were denied due process of law. Nevertheless, the Court also concludes that there is no evidence that the plaintiffs' termination was a violation of either procedural due process or substantive due process. Although plaintiffs assert that Riley admitted in his deposition that he did not follow proper procedures for their dismissal, the referenced portion of Riley's deposition has not been made part of the record. In addition, the plaintiffs have not set forth any procedures which were allegedly required.

As the Court has determined that there is no evidence of any constitutional violation in this case, it is not necessary to address the issue of qualified immunity.

Plaintiffs' complaint also purports to state a cause of action for wrongful termination pursuant to Tenn. Code Ann. § 7-51-1501, which provides, in pertinent part:

> Notwithstanding the provisions of any county, municipal, metropolitan, or other local governmental charter to the contrary, and notwithstanding the provisions of any resolution or ordinance adopted by any such county, municipality or other local governmental unit to the contrary, every employee of every such local governmental unit shall enjoy the same rights of other citizens of Tennessee . . . to participate in political activities by supporting or opposing political parties, political candidates, and petitions to governmental entities; . . . .

9

However, the Court has located no authority holding that this statutory provision creates a separate private right of action for wrongful termination. Therefore, the defendants are also entitled to judgment as a matter of law on this claim.

Lastly, the complaint asserts a cause of action for providing false information to prospective employers. Pursuant to Tenn. Code Ann. § 50-1-105:

> Any employer that, upon request by a prospective employer or a current or former employee, provides truthful, fair and unbiased information about a current or former employee's job performance is presumed to be acting in good faith and is granted a qualified immunity for the disclosure and the consequences of the disclosure. The presumption of good faith is rebuttable upon a showing by a preponderance of the evidence that the information disclosed was:
> (1) Knowingly false;
> (2) Deliberately misleading;
> (3) Disclosed for a malicious purpose;
> (4) Disclosed in reckless disregard for its falsity or defamatory nature; or
> (5) Violative of the current or former employee's civil rights pursuant to current employment discrimination laws.

In this case, there is no evidence that Riley actually provided any information, truthful or otherwise, to any of the plaintiffs' prospective employers. Matthews apparently did receive one bad reference when he applied with the Jackson Police Department, but he does not know who the reference came from. (Matthews Dep. at 60.) In addition, although someone telephoned Hardin County Sheriff Sammy Davidson about Jaggers' application to that department, saying he was the McNairy County Sheriff, the individual did not specifically identify himself and hung up when pressed to do so. (Jaggers Dep. at 41-44.)

10

This evidence is insufficient to overcome the presumption of good faith and grant of immunity to the employer. Therefore, the defendants are entitled to summary judgment on this issue as well.

For all the foregoing reasons, the defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

_/s/ James D. Todd_
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

_22 June 2005_
DATE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 52 in case 1:03-CV-01210 was distributed by fax, mail, or direct printing on June 23, 2005 to the parties listed.

---

Charles Fleet
FLEET LAW FIRM
P.O. Box 44
Maury City, TN 38050

Stephen L. Hale
HALE HATTON
P.O. Box 638
Bolivar, TN 38008

Brandon O. Gibson
PENTECOST GLENN & RUDD, PLLC
106 Stonebridge Blvd.
Jackson, TN 38305

James I. Pentecost
PENTECOST GLENN & RUDD, PLLC
106 Stonebridge Blvd.
Jackson, TN 38305

T. Leigh Jones
HALE HATTON
P.O. Box 638
Bolivar, TN 38008

Honorable James Todd
US DISTRICT COURT